IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL CASE NO. 3:18-cv-00533-MR

| | |
|---|---|
| JENNIFER ANN JASMAINE, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> EDWARD GAZOO, et. al., ) <br> ) <br> Defendants. ) <br> _____ ) | **MEMORANDUM OF DECISION AND ORDER** |

**THIS MATTER** comes before the Court on Defendants' Motion for Summary Judgment. [Doc. 39].

**I.    PROCEDURAL BACKGROUND**

On October 2, 2018, Plaintiff Jennifer Ann Jasmaine, a/k/a Duane L. Fox ("Plaintiff"),[1] proceeding *pro se*, filed this action pursuant to 42 U.S.C. § 1983 based on the alleged failure to protect Plaintiff in violation of her rights under the Eighth Amendment while she was incarcerated at Lanesboro Correctional Institution ("Lanesboro") in Polkton, North Carolina.[2] Plaintiff named the following individuals as Defendants in this matter: (1) Edward

---

[1] Plaintiff was born male and identifies as a transgender female. [See Doc. 1 at ¶ 23; see Doc. 41-5 at ¶ 5: Gazoo Dec.].

[2] Lanesboro has since been converted to a women's prison and renamed Anson Correctional Institution.

Gazoo, identified as the Lanesboro Transportation Coordinator; (2) FNU Lambert, identified as Lanesboro Assistant Unit Manager; (3) Kevin Ingram, identified as a Lanesboro Unit Manager; (4) John Herring, identified as the Lanesboro Superintendent; (5) Reuben Young, identified as an Assistant Secretary for the North Carolina Department of Public Safety (NCDPS); (6) Gary Junker, PhD, identified as the NCDPS Director of Behavioral Health; (7) Marvella Bowman, identified as a Lanesboro Psychologist; (8) Johnnie McCullers, identified as a Lanesboro Case Manager; and (9) Stephanie Hubbard, identified as an NCDPS Classification and Interstate Corrections Compact Coordinator. [Doc. 1 at 2-6].

Plaintiff, as a transgender female, alleges that Defendants failed to protect her from gang member inmates who threatened to attack her no matter where she was incarcerated in North Carolina. [See e.g., Doc. 1 at ¶ 17]. Plaintiff alleges that she told each Defendant in writing that "the gang 'Bloods' had put a hit on her (S.O.S.) stab on sight" and that each Defendant failed to act to protect her after being "made aware that [Plaintiff was] likely to be seriously harmed." [See e.g., Doc. 1 at ¶¶ 13, 18-19]. Plaintiff, however, does not allege that she was attacked at Lanesboro or otherwise after issuing these warnings to Defendants.

Plaintiff's Complaint survived initial review under 28 U.S.C. §§ 1915(e) and 1915A as to all Defendants. [Doc. 10]. Defendant Lambert was dismissed as a Defendant in this matter for Plaintiff's failure to timely serve him. [Docs. 43, 46]. On July 10, 2020, Defendants moved for summary judgment. [Doc. 39]. Defendants argue that summary judgment should be granted because Plaintiff failed to exhaust administrative remedies, because Defendants did not fail to protect Plaintiff under the Eighth Amendment, and because qualified immunity bars Plaintiff's claims against Defendants. [Doc. 40].

Thereafter, the Court entered an order in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the summary judgment motion and of the manner in which evidence could be submitted to the Court. [Doc. 42]. The Plaintiff was specifically advised that she "may not rely upon mere allegations or denials of allegations in her pleadings to defeat a summary judgment motion." [Id. at 2]. Rather, she must support her assertion that a fact is genuinely disputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." [Id. (citing Fed. R.

3

Civ. P. 56(c)(1)(a))]. The Court further advised that:

> An affidavit is a written statement under oath; that is, a statement prepared in writing and sworn before a notary public. An unsworn statement, made and signed under the penalty of perjury, may also be submitted. Affidavits or statements must be presented by Plaintiff to this Court no later than fourteen (14) days from the date of this Order and must be filed in duplicate.

[Id. at 3-4 (citing Fed. R. Civ. P. 56(c)(4))]. Plaintiff has filed nothing in response to Defendants' summary judgment motion. Thus, in terms of evidentiary forecast, the Defendants' is unrefuted.

In support of their summary judgment motion, Defendants have submitted Declarations of Defendants Ingram, Gazoo, McCullers, Herring, Junker, and Bowman; verified discovery responses by Defendants Hubbard and Young; Plaintiff's grievance records; letters written by Plaintiff; and certain prison records. [Docs. 41-1 through 41-14; Doc. 48-2, see Doc. 48-1].

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

4

(1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" in the record. See id.; Fed. R. Civ. P. 56(c)(1)(a). Courts "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Eastern Shore Mkt. Inc. v. J.D. Assoc.'s, LLP, 213 F.3d 174, 180 (4th Cir. 2000). The nonmoving party must present sufficient evidence

from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III. FACTUAL BACKGROUND

The uncontroverted forecast of evidence shows the following.

From approximately March 28, 2018 until May 1, 2019, Plaintiff was in Restrictive Housing for both administrative and disciplinary purposes, at different times and, therefore, isolated from other offenders during all times relevant to this matter. [Doc. 41-1 at ¶ 27: Ingram Dec.; see Doc. 41-5 at ¶¶ 7, 13, 18; Doc. 41-7 at 2]. While Plaintiff was in Restrictive Housing, Defendant Gazoo, the Lanesboro Program Director in the Classification Section, was made aware that Plaintiff wanted to request transfer through

6

the Interstate Corrections Compact (ICC).³ [Doc. 41-5 at ¶ 3, 7]. Plaintiff told Gazoo that she could not return to the general population because of threats by other inmates. [Id. at ¶ 8]. Gazoo explained the ICC transfer process to Plaintiff. [Id. at ¶ 9]. Thereafter, Plaintiff made a request for an out-of-state transfer through the ICC transfer program. [Id. at ¶ 10].

On August 27, 2018, Plaintiff submitted a grievance stating that she has been beaten or assaulted at almost every facility at which she has been housed. Plaintiff complained that the Blood gang had put a "stab on sight" hit on her no matter where she is housed. [Doc. 41-2 at 1]. Plaintiff stated that she requested an ICC transfer to protect her from "an identifiable threat of harm after consideration of all available housing alternatives." [Id. at 2]. Defendant Ingram, the Correctional Housing Unit Manager, rejected this grievance for Plaintiff's failure to follow applicable Administrative Remedy Procedure.⁴ [See Doc. 41-1 at ¶¶ 2-3, 13].

---

³ The ICC enables participating states to enter into agreements for cooperative care, treatment, and housing of offenders sentenced to or confined in prisons and other correctional institutions. North Carolina is a participant in the ICC. See N.C. Gen. Stat. § 148-119, et seq.

⁴ The rejection record, however, does not state what administrative procedure Plaintiff allegedly failed to follow. [See Doc. 41-2 at 3]. Defendant Ingram states that this grievance was also rejected because Plaintiff had another active grievance. [Doc. 41-1 at ¶ 13]. The forecast of evidence, however, does not reflect any other active grievances at this time.

On September 11, 2018, Plaintiff filed another grievance substantially similar to the previous grievance and requesting the same relief. [Doc. 41-3 at 1-2]. The Step One Unit Response to this grievance, prepared by Defendant Ingram, advised Plaintiff that she had failed to provide the name(s) of the individual(s) who were planning to assault Plaintiff, and, without this information, Plaintiff's grievance could not be thoroughly investigated. [Id. at 3]. Defendant Ingram also advised Plaintiff that she was protected from assault by virtue of her Restrictive Housing status. [Id.]. Plaintiff appealed the Step One decision, but without providing the additional requested information. [See id. at 4; Doc. 41-1 at ¶ 20]. At Step Two, Plaintiff was advised that she "will need to provide more information about this matter" and it was concluded that "[n]o further action is required." [Id.]. Plaintiff appealed to Step Three, again without providing the additional information. [See Doc. 41-3 at ¶ 20]. At Step Three, the grievance officer concluded that "[n]o further action is warranted" and dismissed the grievance. [Id. at 5]. Final disposition of Plaintiff's September 11, 2018 grievance occurred on October 30, 2018. [See id. at 5].

On September 24, 2018, Plaintiff submitted another grievance, which was similar to the two previous grievances, including the September 11 grievance that remained active at that time. [See Doc. 41-4 at 1-3]. In this

8

grievance, however, Plaintiff also complained that she had expressed her concerns to her Unit Manager, Assistant Unit Manager, Case Manager, the Superintendent, and "Mental Health," with no response. [Id. at 3]. Plaintiff again sought transfer pursuant to the ICC. [Id.]. Before receiving a response on this grievance, Petitioner filed the instant action. [See Doc. 1]. On October 17, 2018, this grievance was rejected because Plaintiff already had an active grievance in process, namely the September 11 grievance, in violation of Administrative Remedy Procedure Section .0300 of the NCDPS Policy and Procedures. [Id. at 4, ¶ 24].

Defendant Ingram addressed Plaintiff's concerns for her safety of which he was aware. [Doc. 41-1 at ¶ 26]. Defendant Ingram also relayed Plaintiff's allegations of a gang hit to the correctional staff tasked with investigating such matters. [Id. at ¶ 28]. Defendant Ingram believed that other staff had received and addressed Plaintiff's request for an Interstate Corrections Compact transfer. [Id. at ¶ 30].

Defendant Herring, the Superintendent of Lanesboro at the relevant times, has no knowledge of Plaintiff's identification as transgender, no knowledge of assaults by other offenders on Plaintiff at Lanesboro, no knowledge of threats against Plaintiff by other inmates, no recollection of having been advised by Plaintiff or anyone else regarding threats to her

9

Case 3:18-cv-00533-MR   Document 49   Filed 01/25/21   Page 9 of 20

safety, and no recollection of having received or reviewed any written correspondence from Plaintiff requesting transfer or other protection. [Doc. 41-9 at ¶¶ 3, 7-11, 13: Herring Dec.]. Further, as Superintendent, Defendant Herring had no ability to direct that any offender be placed on the ICC list for potential transfer. [Id. at ¶ 12]. As such, Defendant Herring was not involved in any decisions related to any requests by Plaintiff to be placed on the ICC list. [Id. at ¶ 13].

Defendant McCullers, the Program Supervisor at Lanesboro at the relevant times, has no knowledge of assaults by other offenders on Plaintiff at Lanesboro, no knowledge of threats against Plaintiff by other inmates, no recollection of having been advised by Plaintiff or anyone else regarding threats to her safety, and no recollection of having received or reviewed any written correspondence from Plaintiff requesting transfer or other protection. [Doc. 48-2 at ¶¶ 3, 7-10: McCullers Aff.]. Further, as Program Manager, Defendant McCullers was not involved in any control status reviews or any housing assignments, including requests for protective custody, or any classification decisions related to Plaintiff. [Id. at ¶¶ 11-13].

On September 27, 2018, Defendant Junker, the Director of Behavioral Health for the NCDPS at the relevant times, received a letter from Plaintiff in which Plaintiff requested that she be transferred out-of-state for

10

her safety. [Doc. 41-10 at ¶¶ 3, 7: Junker Dec.; see Doc. 41-11]. When he received Plaintiff's letter, Defendant Junker routed it to the appropriate persons in prison administration for review. [Id. at ¶ 9; see Doc. 41-11 at 3-4]. John Beatty, ICC Case Manager, confirmed that Plaintiff was being considered for an ICC transfer. [Id. at ¶ 10; Doc. 41-11 at 5]. Thereafter, Defendant Junker completed the mental health portion of the ICC Medical History Form, which merely provides medical information related to the applicant. [Id. at ¶¶ 11-12]. Defendant Junker, however, in his position as Director of Behavioral Health, did not have control over the ICC transfer process. [Id. at ¶ 14]. Furthermore, as Director of Behavioral Health, Defendant Junker had no control over or participation in Plaintiff's housing status, control status reviews, including requests for protective custody, or classification reviews. [Id. at ¶ 16].

On September 28, 2018, Defendant Bowman, a Corrections Psychological Services Coordinator at Lanesboro, received a written communication from Plaintiff in which she expressed concern for her safety and claimed that she was being targeted for assault by the Bloods gang. [Doc. 41-12 at ¶¶ 2-3, 10-11: Bowman Dec.]. When Defendant Bowman received the communication from Plaintiff, she immediately communicated Plaintiff's concerns to custody staff in accordance with NCDPS policy. [Id.

at ¶ 12]. In short, Defendant "promptly and appropriately addressed [Plaintiff's] safety concerns." [Id. at ¶ 13].

Defendant Hubbard, as the NCDPS Divisional Classification Coordinator at the relevant times, served as the ICC Coordinator and was responsible for maintaining certain records related to the ICC transfer program. [Doc. 41-13 at 2: Hubbard Responses]. When Defendant Hubbard receives requests to participate in the ICC transfer program, she informs the offender in writing that his/her request has been received and is under review. [Id. at 4]. Defendant Hubbard also informs the offender that his/her name has been placed on the waiting list for exchange, which occurs only if the receiving state approves the transfer. [Id. at 4]. Hubbard then requests approval from the appropriate authorities in the NCDPS and the receiving state. [Id. at 4]. Defendant Hubbard does not recall having any interactions with Plaintiff before September 9, 2018, [Id. at 3], and the forecast of evidence reflects nothing regarding any subsequent interactions or any involvement by Hubbard as alleged by Plaintiff.

Defendant Young, as the NCDPS Interim Chief Deputy Secretary of Adult Correction and Juvenile Justice during the relevant times, did not receive reports from inmates fearing for their safety. [Doc. 41-15 at 1, 3: Young Responses]. Further, Defendant Young has never interacted with the

Plaintiff. [Id. at 3].

Finally, contrary to Plaintiff's allegations, there is no evidence before the Court that that Plaintiff had been assaulted by other offenders at almost every prison facility at which Plaintiff has been housed. Moreover, there is also nothing in the record that any Defendant had any knowledge of any such assault, if any occurred. [Doc. 41-1 at ¶ 25; Doc. 41-5 at ¶ 21; Doc. 41-9 at ¶ 14; Doc. 48-2 at ¶ 14; Doc. 41-10 at ¶ 17; Doc. 41-12 at ¶ 14; Doc. 41-13 at 5; Doc. 41-15 at 4-5].

## IV. DISCUSSION

### A. Failure to Exhaust Administrative Remedies

The Defendants argue that the Plaintiff failed to exhaust her administrative remedies prior to filing this action and, therefore, that her Amended Complaint should be dismissed pursuant to the Prison Litigation Reform Act ("PLRA"). [Doc. 20 at 4-6 (citing 42 U.S.C. § 1997e(a))].

The PLRA states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). In Jones v. Bock, 549 U.S. 199 (2007), the Supreme Court stated that "[t]here is no question that exhaustion is mandatory under the PLRA and

13

that unexhausted claims cannot be brought in court." Id. at 211 (citing Porter, 534 U.S. at 524). The Supreme Court has highlighted that the exhaustion of administrative remedies must occur before a civil action is commenced. Porter v. Nussle, 534 U.S. 516 (2002). For example, a prisoner may not exhaust his administrative remedies during the pendency of a Section 1983 action. See Germain v. Shearin, 653 Fed. Appx. 231, 234 (4th Cir. 2016); French v. Warden, 442 Fed. App'x 845, 846 (4th Cir. 2011). In Anderson v. XYZ Correctional Health Servs., 407 F.3d 674 (4th Cir. 2005), the Fourth Circuit determined that:

> [A]n inmate's failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by the defendant. That exhaustion is an affirmative defense, however, does not preclude the district court from dismissing a complaint where the failure to exhaust is apparent from the face of the complaint, nor does it preclude the district court from inquiring on its own motion into whether the inmate exhausted all administrative remedies.

Id. at 683.

Here, the uncontroverted forecast of evidence shows that Plaintiff's September 11, 2018 grievance was not exhausted until October 30, 2018, nearly a month after Plaintiff filed the instant action. And, as noted, Plaintiff offered no evidence to rebut Defendants' showing that Plaintiff failed to exhaust her administrative remedies before filing this lawsuit. Without such

14

Case 3:18-cv-00533-MR   Document 49   Filed 01/25/21   Page 14 of 20

evidence, the Plaintiff has not presented a sufficient forecast of evidence to survive the Defendants' Motion for Summary Judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (the plaintiff can survive a motion for summary judgment by providing sufficient evidence so that "a reasonable jury could return a verdict for [the plaintiff].") Accordingly, the Defendants' Motion for Summary Judgment will be granted on this ground. Because dismissals based on the failure to exhaust administrative remedies are without prejudice, the Court will also address the other grounds for summary judgment asserted by Defendants. See Dillard v. Anderson, No. 2:13-CV-31-FDW, 2010 WL 9553022, at *2 n.2 (W.D.N.C. Sept. 6, 2010) (Whitney, C.J.). ("A dismissal for failure to exhaust administrative remedies is without prejudice.").

### B. Failure to Protect

Claims under 42 U.S.C. § 1983 based on an alleged failure to protect fall within the Eighth Amendment's prohibition against cruel and unusual punishment. Under the Eighth Amendment, "prison officials have a duty … to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994) (quotation marks omitted). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the

15

victim's safety." Id. at 834.

To be found liable under the Eighth Amendment based on a failure to prevent harm, the prisoner first "must show that he was incarcerated under conditions posing a substantial risk of serious harm." Id. (citation omitted). Next, the prisoner must show that the prison official had a sufficiently culpable state of mind. Id. (quotation marks and citation omitted). "In prison-conditions cases, that state of mind is one of deliberate indifference to inmate health or safety." Id. (quotation omitted). "Deliberate indifference" is measured subjectively. The Supreme Court has described the standard as follows:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; <u>the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference</u>…. The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments." … But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

Farmer, 511 U.S. at 837-38 (emphasis added). A prison official is not liable if he knew the underlying facts but believed, even if unsoundly, that the risk to which the facts gave rise was insubstantial or nonexistent. Farmer, 511

16

U.S. at 837. Further, "prison officials who actually knew of a substantial risk to inmate safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Id. at 844.

Here, Defendants' uncontroverted forecast of evidence establishes that there is no genuine issue of material fact on Plaintiff's failure to protect claim. First, the uncontroverted forecast of evidence does not show that Plaintiff was incarcerated under conditions posing a substantial risk of serious harm. See Farmer, 511 U.S. at 834. During the relevant times, Plaintiff was housed in Restrictive Housing and was isolated from other offenders. As such, while Plaintiff may have subjectively feared attack by other offenders, her conditions of confinement did not support the existence of a substantial risk of serious harm. Second, the uncontroverted forecast of evidence fails to show that any Defendant had a sufficiently culpable state of mind, that is, one of deliberate indifference to Plaintiff's health or safety. See id. Because Plaintiff failed to rebut Defendants' forecast of evidence that Plaintiff was not incarcerated under conditions posing a substantial risk of serious harm, the forecast of evidence necessarily forecloses finding that Defendants could have been aware of facts from which they could infer that a substantial risk of serous harm existed. See Farmer, 511 U.S. at 837-38. In any event, Defendants' forecast of evidence demonstrates that any

17

Case 3:18-cv-00533-MR   Document 49   Filed 01/25/21   Page 17 of 20

Defendant who had knowledge of Plaintiff's subjective complaints and/or fears for her safety responded appropriately to that information.

Furthermore, while serious injury is not necessarily required to sustain an Eighth Amendment failure to protect claim, Plaintiff neither alleges nor forecasts any evidence of having suffered <u>any</u> injury after her alleged warnings to Defendants. <u>See</u> <u>Brown v. Dep't of Public Safety and Correctional Services</u>, 383 F.Supp.3d 519, 548 (D.Md. May 13, 2019) (granting summary judgment for defendant prison officials where prisoner plaintiff forecast no evidence of harm resulting from defendants' alleged deliberate indifference to serious risk of harm); <u>cf</u>. <u>Woodhous v. Com. of Va.</u>, 487 F.2d 889 (4th Cir. 1973) (implying prisoner's legitimate fear of attack may be sufficient to maintain failure to protect claim).

In sum, there is no genuine issue of material fact as to Plaintiff's failure to protect claim and it will be dismissed on those grounds.

### C. Qualified Immunity

"Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." <u>Henry v. Purnell</u>, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). "To determine whether an officer is entitled to qualified immunity, the court must examine (1) whether the plaintiff has

18

Case 3:18-cv-00533-MR   Document 49   Filed 01/25/21   Page 18 of 20

demonstrated that the officer violated a constitutional right and (2) whether that right was clearly established at the time of the alleged violation." E.W. ex rel. T.W. v. Dolgos, 884 F.3d 172, 178 (4th Cir. 2018) (internal quotation marks omitted). The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." Smith v. Ray, 781 F.3d 95, 100 (4th Cir. 2015) (internal quotation marks omitted).

Here, because Plaintiff has not forecasted evidence that Defendants violated a constitutional right, Defendants are entitled to qualified immunity on Plaintiff's individual capacity claims. As such, Defendants' Motion for Summary Judgment based on qualified immunity will be granted.

## V. CONCLUSION

For the reasons stated herein, the Court will grant Defendants' motion for summary judgment.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 39] is **GRANTED** and this action is hereby **DISMISSED with prejudice**.

The Clerk is instructed to terminate this action.

19

Case 3:18-cv-00533-MR   Document 49   Filed 01/25/21   Page 19 of 20

**IT IS SO ORDERED**.

Signed: January 25, 2021

Martin Reidinger
Chief United States District Judge